**J. MICHAEL FARRELL, TRIAL LAWYER**
**ATTY. ID. NO. 33803**
**718 ARCH STREET**
**SUITE 402N**
**PHILADELPHIA, PA 19106**
**(215) 925-1105**
*mike@farrelltrial.com*
*ATTORNEY FOR DEFENDANT*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | Criminal No.  13-445 (TJS) |
| | : | |
| H. JACK MILLER | : | |
| | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

NOW COMES, H. Jack Miller, by J. Michael Farrell, Esquire, his attorney, and submits this Sentencing Memorandum to assist this Court.

## INTRODUCTION

"There is always one person in everyone's life that gives without asking for anything in return. A true altruist who has one goal and that goal is to ensure the happiness of others, often at their own expense. This description sums up [Noah Miller's] father, Jack Miller [my client]."  I choose to open this Sentencing Memorandum with that quote which is taken from the first paragraph of my client's son, Noah's letter to this Court, because it authentically describes the quality of my client and of his life.

1

My client, H. Jack Miller, is 51 years old. He was born in Philadelphia, Pennsylvania and has two siblings.

He was raised in Northeast Philadelphia and moved to Richboro, Pennsylvania in 1987 after he married Judy Belchatowski.  The couple who have been married for 27 years have three children, two of which currently reside at home.  The family now resides in Boca Raton, Florida.

My client's parents have some physical health issues and do not know about his current situation.  His father suffers from dementia-like symptoms requiring daily care, and his mother suffers from back problems and has a mass in her brain but refuses to have any kind of treatment.

My client suffers from a number of health problems himself, including severe back and neck pain, high blood pressure and high cholesterol.  He has also been experiencing anxiety and problems sleeping since the inception of the instant offense and was prescribed anti-anxiety medication and sleeping pills.  As a result of my client's severe neck pain, my client underwent a recommended surgery on April 8, 2014 and is currently recovering from said operation.

My client has a long history of founding and operating as CEO and president several financial companies throughout his career.  While he has been involved in these real estate partnerships and financial companies/businesses since 1989, his primary company is Gelt Financial, a commercial lending and real estate partnership which he founded and was president and CEO up until the instant offense and which his brother, Ari, has an ownership interest. In addition to Gelt Financial, my client has an interest in several other holding companies.

My client is described as an amazing father and friend. He has the support of his family and friends who know what kind of person he really is.

2

My client has an extensive history of philanthropy in the Jewish community. He has spent his entire adult life donating time and money to various charitable organizations. Most of his efforts have centered on education and synagogues. My client and his wife have supported the Perelman Jewish Day School and South Florida Jewish Learning Academy for many years. He has served on the Board of Directors for both organizations and was a member of the Perelman School's finance committee. My client also volunteers at a home for developmentally delayed adults. While he has limited his involvement because of the instant offense, he plans to continue his charitable works after he is sentenced.

My client has suffered substantial punishment to date. In addition to the shame to his and his family's fine name, all of the banks and financial institutions which my client has used and with whom he had an exemplary track record have terminated his accounts and informed him that they would not permit any account in his name or any account in the name of a business of which he is an owner in whole or in part.

For the reasons set forth herein, informed by my client's individual characteristics, his offense conduct, the advisory guideline range, the §3553(a) factors, and the Parsimony Provision, it is requested that the Court impose a sentence of probation which is sufficient, but not greater than necessary, to achieve the goals of sentencing.

## POST-BOOKER SENTENCING IN THE THIRD CIRCUIT - THREE STEP PROCEDURE FOR IMPOSING SENTENCE

In a series of post-Booker cases, the Third Circuit has distinguished itself from among the Circuits by its treatment of the sentencing guidelines as merely advisory.

The Third Circuit has shown a more conservative approach to the methodology the courts must utilize when imposing a criminal sentence. The Circuit has adopted a three-step procedure which requires a pre-Booker calculation of the guideline range, and a formal ruling on factual disputes and departure motions. It reasons that because the guidelines remain an integral part of the sentencing process, an accurately calculated range is a critical starting point in the district court's analysis. This view rejects that of the Seventh and Ninth Circuits, which have ruled that guideline departures are obsolete in the wake of Booker.

The three-step procedure requires judges to (1) calculate the guideline range correctly, adhering to the manual's application principles and resolving factual disputes affecting the calculation; (2) formally rule on departure motions in light of the (now advisory) pre-Booker case law, stating clearly how a departure affects the guidelines calculation; and (3) exercise discretion under §3553(a) by *meaningfully* considering the *relevant* factors it lists - merely reciting them for the record is insufficient - and imposing a sentence "regardless of whether it varies from the sentence calculated under the Guidelines." United States v. Gunter, 462 F.3d 237 (3rd Cir. 2006).

The Circuit specifically endorses the terminology of "departure" to refer to a sentence outside the range that was contemplated by the guidelines system, and "variance" to refer to a sentence outside of the range that was imposed under the court's discretion pursuant to §3553(a). It asks that district courts and counsel employ this terminology as well. United States v. Jackson, 467 F.3d 834, n.2 (3rd Cir. 2006). For now, the Third Circuit directs that the first two steps be done precisely. However, it leaves open the possibility that in some cases, errors committed during the first two steps may be harmless, in light of the fact that it is the ultimate sentence imposed at step three that is subject to the reasonableness review. Id at n.6.

4

The bottom line is that the Third Circuit's post-<u>Booker</u> jurisprudence manifests a fundamental respect for judicial discretion and substantial deference to sentencing judges, as long as the record adequately explains the reasons for the sentence and reflects judicial consideration of the relevant factors under §3553(a). Thus far, it has only reversed cases for procedural irregularities (not substantive reasonableness), such as where the record does not reflect the reasons for the sentence, or where the district court found that it had no discretion to consider a particular factor. This encourages judges to impose a sentence that truly "fits the crime and the criminal," guided principally by the statute's universal directive that a court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

### *STEP ONE* - ADVISORY GUIDELINE CALCULATION ANALYSIS

The Presentence Investigation Report identifies my client's total offense level as 6 and Criminal History Category as I, resulting in an advisory sentencing guideline range for imprisonment of 0 to 6 months.

The defense agrees that his total offense level is 6 and his guideline range for imprisonment is 0 to 6 months.

### *STEP TWO* - FACTORS THAT MY WARRANT TRADITIONAL DEPARTURE

Neither the Government nor the defense moves for traditional departure.

### *STEP THREE* - 18 U.S.C. § 3553(A) ANALYSIS

The Court must impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in paragraph (2) of 18 U.S.C. Section 3553(a). Those purposes are:

(2) the need for the sentence imposed-
  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2).

In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(l)-(7).

### Nature and Circumstances of the Offense

On September 5, 2013, an Information was filed in the Eastern District of Pennsylvania charging my client with willful failure to maintain an effective anti-money laundering program and aiding and abetting, in violation of 31 U.S.C.§§ 5318(h) and 5322(a) and 18 U.S.C. § 2 and willful failure to file a suspicious activity report and aiding and abetting, in violation of 31 U.S.C.§§ 5318(h) and 5322(a) and 18 U.S.C. § 2.

On October 7, 2013, the Defendant appeared before the Honorable Timothy J. Savage and pled guilty to the two count Information.

### History and Characteristics of the Defendant

My client, H. Jack Miller, was born on May 5, 1962 in Philadelphia, Pennsylvania. His mother, Charlotte Miller (nee Goren), age 78, and father, Jerry Miller, age 78, a retire real estate investor, reside in Warminster, Pennsylvania. My client has two siblings, J. Evan Miller (45) of Richboro, Pennsylvania, and M. Ari Miller (39) of Cherry Hill, New Jersey.

My client was raised in Northeast Philadelphia in a stable, loving environment. He describes his family as a typical, hardworking, middle-class family. His father was self-employed and worked 15 hours a day while is mother stayed at home and cared for the family.

My client's parents do not know about his current situation.  His parents have some physical health issues, and my client did not want to burden them with this news. My client's father suffers from dementia-like symptoms requiring my client's brother and sister-in-law to provide daily care.  His father was previously diagnosed with a leukemia-like deficiency when he was in his 40s and was told that he had six months to live, but he underwent an experimental treatment which was successful.  Two summers ago, however, he had a hip replacement and began going downhill mentally after the surgery.

My client's mother also suffers from some physical health issues. She has a mass in her brain but refuses to have any kind of treatment.  My client does not know whether the mass is malignant or not. She also suffers from back problems.

My client moved out of his parents' home in 1987 after he married Judy Belchatowski (49).  The couple who have been married for 27 years have three children, E. Joshua Miller (25), a recent college graduate who currently resides at home while looking for a job; M. Noah Miller (22) who works in commercial real estate and resides in Miami, Florida; and A. Yoni Miller (19) who resides at home and is starting his own real estate factoring business.

My client's wife is his best friend and biggest supporter.  He and his family live in a 7,900 square foot house in Boca Raton, Florida. They purchased the five-bedroom, eight bath home about eight years ago. Prior to that, the family lived in Richboro, Pennsylvania.

According to my client's wife, it was "love at first sight" for the couple. They were engaged within three months of meeting and married after nine months. She describes herself as her husband's biggest fan. According to Mrs. Miller, my client is everyone's best friend and will do anything for anyone. She describes him as an amazing father and friend. My client's wife also notes that their family and true friends know what kind of person my client really is and that they all have remained supportive.

My client is five feet, eleven inches tall and weighs approximately 220 pounds. He has blue eyes and brown hair. He does not have any tattoos but does have a scar on his left middle finger from a childhood accident.

My client suffers from a number of health problems. He has had back pain since October of 2000 when he was involved in an automobile accident and suffered fragmented discs requiring him to undergo a laminectomy at Lower Bucks Hospital. My client also suffers from high blood pressure and high cholesterol and had kidney stones approximately five years ago. Additionally, my client has been experiencing substantial shooting pain in his arm. A consultation revealed that he has broken discs in his neck which are affecting the nerves, and surgery was recommended. On April 8, 2014, my client underwent the recommended operation and is currently recovering from same.

My client has no history of mental or emotional problems and no history of treatment for such problems. Since the inception of the instant offense, he has been experiencing anxiety and problems sleeping. He consulted with his doctor, William DeMarchi, M.D., who prescribed anti-anxiety medication and sleeping pills. He sees Dr. DeMarchi about every three to six months.

My client feels as though he is under intense pressure and is so worried and stressed that it's hard to motivate himself.  He is very troubled by the loss of his reputation and the tremendous effect the instant offense has had on his business and, more importantly, his family. My client also believes that he is suffering from post-traumatic stress syndrome (PTSD).

My client has never used a controlled substances.  He does drink alcohol occasionally.

During middle school, my client was diagnosed with dyslexia while attending Baldi Middle School. He left Baldi and attended Wordsworth Academy until he finished 10th grade. My client then attended Wyncote Academy until graduation.

My client has been involved in several real estate partnerships and other financial companies and business holdings since 1989.  His primary company, Gelt Financial, is a commercial lending and real estate partnership which he was president and CEO up until the instant offense and which his brother, Ari, has an ownership interest. Gelt Financial is currently in Chapter 11 Bankruptcy. The bankruptcy plan was recently confirmed and my client is working hard to rebuild the company. Currently, my client nets approximately $5,800 per month. His salary is expected to increase now the bankruptcy has gone through.

In addition to Gelt Financial, my client has an interest in the following holdings: Gelt Holdings, LLC; Gelt Properties, LLC; GFCIB, LLC; Real Estate Management Advisors, LLC; Crescent Business Center; Equity Partners 36; Friends Lane, LLC; HJM Real Estate, LLC; MFP'8, LP; Huntingdon Valley Office Center; and Miller Boys Properties.  He earns an additional $10,000 per month in commission and business income.

My client has an extensive history of philanthropy in the Jewish community, which he described as more important than his career. He has spent his entire adult life donating time and

money to various charitable organizations. Most of his efforts have centered on education and synagogues. My client and his wife have supported the Perelman Jewish Day School for many years. He served on the board at the center and was a member of the school's finance committee. My client also volunteers at a home for developmentally delayed adults. While he has limited his involvement because of the instant offense, he plans to continue his charitable works after he is sentenced.

### A. Need for Just Punishment in Light of the Seriousness of the Offense (Retribution)

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, her degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).

The Defendant has accepted responsibility and pleaded guilty, admitting his failure as Chairman of the Board and President and CEO of Public Savings Bank to implement an adequate anti-money laundering program which should have required the proper monitoring of foreign correspondent accounts during the periods of January, 2009 though January, 2011 and his failure to report a suspicious transaction in connection with an $86,400.00 wire transfer on March 25, 2010.

The Congressional Legislation requiring, upon penalty of criminal responsibility, an effective anti-money laundering program was in the security interests of the United States. Although my client

accepts responsibility for his failures, his blameworthiness results from the culpable mens rea of deliberate indifference and/or willful blindness but not the traditional concept of scienter, that is engaging in conduct which he knew to be wrong at the time.

Therefore, for a man with a demonstrated life and reputation of the Defendant, a conviction and the shame associated with the conviction is sufficient punishment.   Moreover, my client has suffered substantial punishment to date.  In addition to the shame to his and his family's fine name, all of the banks and financial institutions which my client has used and with whom he had an exemplary track record have terminated his accounts and informed him that they would not permit any account in his name or any account in the name of a business of which he is an owner in whole or in part.

### B.       Need for Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.; see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.")  Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.   *See* Andrew von Hirsch *et al.  Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1.

It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.

The Court's attention is specifically directed to the November 2010 report of The Sentencing Project *"Deterrence in Criminal Justice, Evaluating Certainty vs. Severity of Punishment."* This report concludes that "existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive. Overall, the evidence indicates that the deterrent effect of lengthy prison sentences would not be substantially diminished if punishments were reduced from their current levels."

All empirical research shows longer sentences do not deter. For "drug trafficking...activity, removing individual offenders does not alter the structural circumstances conducing to the crime." i.e. one goes to prison, another takes its place. Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 29 (2006).

In the instant case, there can be no doubt that my client will not re-offend.

It is acknowledged that general deterrence, that is deterring those similarly situated from engaging in similar conduct or, more specifically, permitting failures as did my client, is a consideration for this Court.

### C.    Need for Incapacitation

My client has a low risk of recidivism. He is 51 years old, a first offender, has no history of

drug or alcohol abuse, has a high school education, has a history of legitimate employment, has been married for 27 years, and is a non-violent offender.  For all offenders in Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. Undoubtedly, for those like my client who have high school educations, have been employed, have been married, are drug free and over 50, the combined rate is even lower.  *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism].*  Finally, offenders like my client with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, *Recidivism and the "First Offender, "* at 13-14 (May 2004) [hereinafter *First  Offender].*

The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *See First Offender* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); *Measuring Recidivism* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines if incorporated into the criminal history computation"). The Commission has not implemented any such revisions to the criminal history guidelines, but has recently stated that age "may be relevant" in granting a departure. U.S.S.G. § 5H1.1, p.s.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes, this Court should consider the statistically low risk of recidivism presented by my client's history and characteristics. *See, e.g., United States V. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v.*

*Hamilton,* 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking

into account policy considerations with regard to age recidivism not included in the Guidelines");

*United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based

on defendant's age, which made it unlikely that he would again be involved in a violent crime);

*United States v. Urbina,* slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering

low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and

strong family ties); *United States v. Cabrera,* 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting

variance because defendants "with zero criminal history points are less likely to recidivate than

all other offenders"); *Simon V. United States,* 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing

variance in part on defendant's age of 50 upon release because recidivism drops substantially

with age); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting

variance to 57-year-old defendant because recidivism drops with age); United States v. Ward,

*814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time*

*offender since guidelines do not "account for the length of time a particular defendant refrains*

*from criminal conduct before committing his first offense).*

  My client not only fits this profile, he also exhibits several of the characteristics that the

Sentencing Commission has identified as indicators of reduced risk of recidivism.

### D. Needed Educational or Vocational Training, Medical Care or Other Correctional Treatment (Rehabilitation)

  The sentence imposed must ensure that "needed... medical care" is provided "in the most

effective manner." 18 U.S.C. § 3553(a)(2)(D). The Commission now recognizes that "[physical

condition... may be relevant in determining whether a departure is warranted," and has always

recognized that "in the case of a seriously infirmed defendant, home detention may be as

14

sufficient as, and less costly than, imprisonment." USSG §5H1.4, p.s. (2010).

Given my client health problems, specifically, his more recent diagnosis of herniated discs in his neck for which he has underwent surgery, release for the opportunity of continued treatment should be given great weight.

### The Parsimony Provision - Post Fanfan/Booker

Pursuant to <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), and <u>United States v. Fanfan</u>, 125 S.Ct. 26 (2005), and its progeny that while Court's must "seriously consider" the guidelines and give reasons for sentences outside the range, "in doing so the Court should not follow the old 'departure methodology'" Especially instructive, are the words of Judge Adelman of the Eastern District of Wisconsin in his opinion <u>United State v. Ranum</u>, 353 F.Supp.2d 984 (E.D.Wis. January 19, 2005), in which he stated:

> The guidelines are not binding, and the Court need not justify a sentence outside of them by stating factors that take the case outside the "heartland". Rather court are free to disagree in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as that the ultimate sentence is reasonable and carefully supported by reasons tied to §3553(a) factors, <u>Id</u> at 987.

The overriding principle and basic mandate of Section 3553(a) requires this Court to impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in Section 3553(a)(2) which are as follows:

(a)   Retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");
(b)   Deterrence;
(c)   Incapacitation ("to protect the public from further crimes); and
(d)   Rehabilitation ("to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner").

The sufficient, but not greater than necessary requirement, is often referred to as the "Parsimony Provision."  The Parsimony Provision is not just another "factor" to be considered along with the others set forth in Section 3553(a), it, in fact, sets an independent limit on the sentence a Court may impose.  Judge Becker of the Third Circuit in <u>United States v. Denardi</u>, 892 F.2d 269, 276-77 (3rd Cir. 1989), in his opinion, concurring in part and dissenting in part stated: "since Section 3553(a) requires a sentence to be no greater than necessary to meet those purposes, a greater than necessary sentence is reversible, even if within guideline range."

In determining the sentence minimally sufficient to comply with the Section 3553(a)(2) purposes of sentencing, the Court must consider the several factors listed in 3553(a).  These factors are:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2)  the kinds of sentences available;
> (3)  the guidelines and policy statements issued by the sentencing commission, including the now non-mandatory advisory guideline range;
> (4)  the need to avoid unwarranted sentencing disparity; and
> (5)  the need to provide restitution where applicable.

Neither the statute itself nor <u>Booker</u> suggest that any one of these factors is to be given greater weight than any other factor.  However, it must be stressed that all factors are subservient to Section 3553(a)'s mandate to impose a sentence not greater than necessary to comply with the four purposes of sentences.

The bottom line post <u>Booker</u> and <u>Fanfan</u> is that the trial court must now impose a sentence that is minimally sufficient to accomplish certain specified purposes of sentencing, and the guidelines are only the third of five equally important factors to be considered in determining

16

the minimally sufficient sentence.  18 U.S.C. §3553(a).

Under Booker, the sentencing court must still consider the Guidelines, but they are merely one of the factors that go into the sentencing determination.  The court must also consider the other sentencing factors set forth in 18 U.S.C. §3553(a).

The United States Supreme Court in Booker did not intend that post-Booker District Court sentencing become a "de facto mandatory guideline system."  Since to do so, would continue the Sixth Amendment constitutional problem that gave rise to Booker in the first place.

### Implications of Rita, Gall and Kimbrough

In 2007, the United States Supreme Court with its opinions in Rita v. U.S., 127 S.Ct. 2456 (2007),  Gall v. U.S., 128 S.Ct. 586 (2007) and Kimbrough v. U.S., 128 S.ct. 558 (2007), irreversibly changed the federal sentencing system and energized and encouraged trial courts to individualize sentences not greater than necessary.

The Guidelines, "formally mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." Kimbrough, 128 S.Ct. at 564; see also Gall, 128 S.Ct. at 602 (same).  "The statute, as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to achieve the goals of sentencing." Kimbrough, 128 S.Ct. at 570.

Because the "Guidelines are not the only consideration,"  the judge "after giving both parties an opportunity to argue for whatever sentence they deem appropriate,"  "should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party." Id.  The judge must independently evaluate the appropriate sentence in light of the Section 3553(a) purposes and factors, and must consider arguments that the guideline should not

apply on general policy grounds, case-specific grounds (including guideline-sanctioned departures), or "regardless." Rita, 127 S. Ct. at 2463, 2465, 2467-68. In doing so, the judge "may not presume that the Guidelines range is reasonable." Gall, 128 S.Ct. at 596-97; see also Rita, 127 S.Ct. at 2465 (same).

Of great importance is the fact that district court judges must now consider and respond to nonfrivolous arguments that the guideline sentence itself reflects an unsound judgment because it fails properly to reflect §3553(a) considerations, does not treat the defendant's characteristics in the proper way; or a different sentence is appropriate regardless. Rita, 127 S.Ct. at 2465, 2468. District courts are no longer required, or permitted, to simply defer to Commission policies. Id. Courts of appeals may not "grant greater fact-finding leeway to [the Commission] than to [the] district judge." Id at 2463. Even the government has "acknowledge[d] that... 'courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the guidelines.'" Kimbrough, 128 S.Ct. at 570.

### Substantive Reasonableness

In the body of case law it has developed thus far, where it has examined the substantive reasonableness of sentences, the Court has been consistently deferential to sentencing judges, regardless of whether the sentence falls within the guideline range, or above or below the range. Its first published opinion on this issue, United States v. Cooper, 437 F.3d 324 (3rd Cir. 2006), held that the guidelines do not enjoy a presumption of reasonableness and that courts are free to disregard the range in light of other sentencing factors set forth in 18 U.S.C. §3553(a). The appellate court therefore has jurisdiction to review all sentences for reasonableness, including those imposed within the guideline range. Id., see also U.S. v. Lloyd, 469 F.3d 319 (CA 3, 2006)

18

A court may impose a non-guideline sentence for reasons that are prohibited under the guideline system. United States v. Gunter, 462 F.3d 237 (3rd Cir. 2006)(crack/powder cocaine penalty differential).  Moreover, factors that do not justify a departure under the guideline system may be viewed with greater latitude so as to justify a non-guideline sentence under §3553(a). United States v. Jackson, 467 F.3d 834, n.8 (3rd Cir. 2006)(extraordinary acceptance of responsibility).

### A Probationary Sentence Provides Appropriate Punishment and Deterrence.

The Supreme Court has recognized that even a term of probation without any incarceration constitutes significant punishment. *See Gall v. United States,* 128 S.Ct. 586, 595-96 (2007) (straight probation without home confinement is punitive and the conditions imposed "substantially restrict... liberty"). The court also recognized that imposing a term of incarceration in the name of promoting respect for the law in a case where a particular defendant's unique circumstances suggest a more lenient sentencing alternative actually could promote disrespect for the law:

> Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

*Id.* (citation omitted).

A probationary sentence would be on all fours with a move by the Sentencing Commission to make alternatives to incarceration available under the advisory guidelines to more defendants. On May 1, 2010, the Sentencing Commission sent to Congress a series of

19

amendments to the sentencing guidelines that, in relevant part, increase the availability of

sentences that do not include incarceration. An April 19, 2010 press release from the

Commission describing the amendments quoted William K. Sessions, the Commission

Chairman, as follows:

> The Commission has heard from virtually every sector of the criminal
> justice community that there is a great need for alternatives to
> incarceration. ... Providing flexibility in sentencing for certain low-
> level, non violent offenders helps lower recidivism, is cost effective,
> and protects the public. The Commission's action in this area amounts
> to a very modest but important step in the right direction.

My client not only fits this profile, he also exhibits several of the characteristics that the

Sentencing Commission has identified as indicators of reduced risk of recidivism. He is 51 years

old, a first offender, has a high school education, has a history of legitimate employment, has been

married for 27 years, is a non-violent offender, and has no history of drug or alcohol abuse . Two

recent studies[1] conducted by the Sentencing Commission show following:

- Age: "Recidivism rates decline relatively consistently as age increases," from

    35.5% under age 21, to 9.5% over age 50.[2] Under the Parole Commission's Salient

    Factor Score (SFS), which is a better predictor of recidivism than Criminal

    History Category, the older the defendant is and the fewer the number of prior

    commitments, the less likelihood of recidivism. Age is a powerful component of

---

[1]Measuring Recidivism: The Criminal History Computation of the Federal Sentencing
Guidelines (hereinafter "Release 1"), http://www.ussc.gov/publicat/Recidivism_General.pdf; and
A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S.
Parole Commission Salient Factor Score (hereinafter "Release 2"),
http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf.

[2]Release 1 at 12

recidivism prediction, which the Guidelines do not take into account.[3]

- Employment: Stable employment in the year prior to arrest is associated with a lower risk of recidivism.[4]

- Education: Recidivism rates decrease with educational level (no high school, high school, some college, college degree).[5]

- Non-Violent Offenders sentenced under the fraud, larceny and drug guidelines are the least likely to recidivate.[6]

## CONCLUSION

For the reasons set forth herein, informed by my client's individual characteristics, his offense conduct, the advisory guideline range, the §3553(a) factors, and the Parsimony Provision, it is requested that the Court impose a sentence of probation which is sufficient, but not greater than necessary, to achieve the goals of sentencing.

## EXHIBITS

1. Noah Miller letter, undated;

2 A. Yoni Miller letter, undated;

3. Evan Miller letter dated January 20, 2014;

---

[3]Release 2 at 8, 13-15

[4]Release 1 at 12

[5]*Id.* at 12

[6]*Id.* at 13

21

4. Arnold J. Diamond letter dated January 24, 2014;

5. Rabbi David Max letter dated January 26, 2014;

6. Robert Kofsky letter dated January 26, 2014;

7. Scott Wechsler letter dated January 27, 2014;

8. Saul Ginsberg, D.M.D. letter dated January 28, 2014;

9. Jason Waksman letter dated February 3, 2014;

10. Nat and Caren Bosk letter dated February 23, 2014;

11. Amy Marie Huber letter dated March 5, 2014;

12. Richard P. Shore letter dated March 5, 2014;

13. Alan J. Candell letter dated March 24, 2014;

14. Bob Wexler letter dated March 31, 2014;

15. Jason Glazier, Ph.D. letter dated April 14, 2014;

16. Rabbi Yehuda Shemtov letter, undated; and

17. H. Jack Miller letter, undated.

Respectfully submitted,

J. MICHAEL FARRELL, ESQUIRE
Attorney for Defendant

Dated: 6/24/14

**J. MICHAEL FARRELL, TRIAL LAWYER**
**ATTY. ID. NO. 33803**
**718 ARCH STREET**
**SUITE 402N**
**PHILADELPHIA, PA 19106**
**(215) 925-1105**
*mike@farrelltrial.com*
*ATTORNEY FOR DEFENDANT*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **V.** | : | **Criminal No.  13-445 (TJS)** |
| | : | |
| **H. JACK MILLER** | : | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendant's Sentencing Memorandum was served by email and first class mail upon the following on this 24th day of June, 2014.

Terri A. Marinari, A.U.S.A.
Assistant United States Attorney
United States Attorney's Office
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106-4476
terri.marinari@usdoj.gov

_____
J. MICHAEL FARRELL, ESQUIRE